NONÉS, PLAINTIFF AND APPELLANT, *v.* PONCE SCHOOL BOARD,
DEFENDANT AND APPELLEE.

APPEAL from the District Court of Ponce in an Action for
Rescission of Contract, etc.

No. 1447.—Decided March 16, 1917.

EXPERT EVIDENCE—FINDINGS OF FACT—ERROR.—When a trial judge finds that
concrete used in building walls was not mixed in the proportions stipu-
lated in the contract—that is, one part cement, two parts sand and four
parts gravel—based exclusively on the testimony of an expert that the
concrete had been mixed in different proportions, and the said expert ex-
plains the method employed by him to obtain the results found, and it is
proved and found by the court that in following the said method the appar-
ent volumes in which the materials were mixed are not obtained but only
the absolute volumes in which they are found in the concrete, it is mani-
fest error to reach that conclusion only because the said expert used the
word "parts" and to assume that this word could only refer to the appar-
ent volumes when it might well have reference, and probably did, to the
absolute volumes, inasmuch as the expert testified that he employed the
said method to ascertain the proportions in which the materials we·e to
be found in the concrete.

ID.—CONFLICTING EVIDENCE—FINDINGS OF FACT.—The plaintiff having alleged
that the cement, sand and gravel used by him for the concrete in building
certain walls were previously examined and accepted by the inspector of
the defendant, and the latter having answered that the sand and gravel
used were of inferior quality and had not been accepted, the decision of
the court that it was unable to conclude that the said materials were bad,
or that they had not been accepted prior to their use, is tantamount to find-
ing that the defendant had not proved its allegation and that plaintiff's con·
tention was correct, thus deciding the conflict in favor of the latter.

ID.—ID.—ANSWER OF WITNESS.—While the answer of an educated person is
responsive .to the question put and an interrogation regarding the constitu-
ent parts of a mixture of concrete calls for a response regarding such parts,
nevertheless if his reply shows that he referred to something else, it cannot be
held that his answer was responsive to the question.

The facts are stated in the opinion.
*Mr. Antonio F. Castro* for the appellant.
*Mr. Libertad Torres Grau,* district *fiscal,* for the appellee.
MR. JUSTICE ALDREY delivered the opinion of the court.

   As the appellant bases this appeal principally on the allega-
tion that the lower court committed manifest error in weigh-
ing the evidence and that the judgment rendered was a con-
sequence of such error, it is necessary to state the funda-

mental issue between the parties and review the evidence introduced at the trial.

. The school board of Ponce authorized the construction of a school building in that city under "Job 63," subject to the inspection and supervision of the Commissioner of the Interior and his subordinates, and on July 15, 1913, the chairman of the said board, the Commissioner of the Interior and José A. Bruno entered into a contract in which Bruno agreed to construct the building for $33,735. After completing the foundations, Bruno, with the assent of the other contracting parties, assigned the contract on October 25 to Adolfo Nones, a civil engineer. Two days later Nones took charge of the work and on November 14 began to erect the walls upon the said foundations and had laid three courses of concrete about three feet high each, having begun the laying of the first on said day, the second on November 22, which was completed on November 26, and the third on November 28, which was completed on December 2, when he received orders from superintendent of construction Nelson to suspend the concrete work because the concrete used in the three courses already laid was soft, and two or three days later the contractor suspended all work on the building in accordance with the orders of the said superintendent. The Commissioner of the Interior caused the walls to be examined and on January 8 ordered contractor Nones to tear them down and build new walls because the concrete was soft and utterly unsuitable for the work in which it was being used. Nones asked whether that work was to be done at his expense or that of the school board and was informed that it was for his account, whereupon Nones stated that he was not disposed to assume a liability which he had not incurred, and on January 28 he was notified that unless he began to remove the defective concrete within five days it would be necessary to rescind the contract. On the day following Nones filed the complaint in the present action against the Ponce school board and the

Commissioner of the Interior, but later amended the same by eliminating the latter.

The walls were torn down in March and the work continued without the said contractor.

The parties admit that the concrete employed in the three courses of the walls constructed by Nones was soft at the time he received the order to suspend work and that it could be crumbled with the fingers, therefore the principal issue in this action is whether this was the fault of Nones.

As fundamental grounds of his action for the resolution of the contract and to recover certain sums as damages, Nones alleged that all the materials composing the concrete for the walls were previously examined and accepted by superintendent of construction Nelson and his inspectors, who were present personally and saw all of the work done on the said construction; that in doing the work he complied with his contract in every particular and adhered to the ordinary technical and practical rules and requirements, using first-class equipment and machinery, and mixing, laying and setting the concrete with the greatest care and for the time necessary to obtain, as he did, a concrete of superior quality and of much greater strength than that required for the building, and that the order to demolish the work done by him was entirely arbitrary, contrary to the opinions of the engineers of the Department of the Interior, inspired by negligence and erroneous judgment and in disregard of his rights, showing bad faith and failure to exercise honest discernment.

In answer to these allegations the defendant averred that the sand and gravel employed by the plaintiff in making the concrete for the walls were inferior; that they were never accepted by the person authorized to do so because they did not conform to the stipulations of the contract or to the specifications for the work; that the plaintiff was warned that their use would not be allowed unless he washed and sifted them, and that the plaintiff did not comply with the contract or with the conditions required by the plans and specifications

for the work or with the ordinary technical and practical rules, but used concrete of a quality inferior to that stipulated for which made the collapse of the building certain. The defendant also filed a counterclaim alleging that Nones did not comply with the contract but built the walls with concrete of a quality inferior to that agreed upon; that he did not tear down the walls when he was ordered to rebuild them at his own expense, thereby making it necessary for the Department of the Interior to do the work; that Nones had contracted to complete and deliver the building on February 28, 1914; that his failure to do so compelled the defendant to rent other buildings for school purposes, and that he had furnished a bond for $6,000 to guarantee the fulfilment of the contract. It was prayed that the court declare the contract rescinded and the bond forfeited and adjudge that the plaintiff pay the defendant $480 as damages.

The final judgment of the court a quo dismissed the complaint, holding that the plaintiff should recover nothing from the defendant, but that the counterclaim should be sustained, the contract for said construction between Nones and the school board rescinded, and, to meet the liability of the contractor to respond for the sum of $3,373.50, that the bond furnished to secure the performance of the contract and $1,525.60, the value of the foundations constructed by Bruno and assigned by him to Nones, be confiscated, and that Nones should also pay to the defendant $480 as damages, together with the costs and disbursements of the action.

Before demolishing the walls in question the parties took blocks from the three courses and marked the one from the first course laid on the foundations as No. 1, that from the second course as No. 2, and that from the third and last course as No. 3. The defendant sent its samples to the Chemical Laboratory of Pittsburg, Pennsylvania, where they were received by chemist E. H. Craver in three boxes, the box marked No. 1 containing sample No. 3; box No. 2 containing sample No. 1, and box No. 3 containing sample No. 2.

The said chemist analyzed these samples of concrete and his report gave rise to a strong controversy at the trial, for the plaintiff introduced abundant expert evidence to show that the proportions found by Craver refer to the absolute volumes in which the materials appear in the concrete, and not to the apparent volumes which it contained when the mixture was made, and, therefore, his report cannot serve as a guide for determining the proportions in which the contractor mixed the cement, sand and gravel for the concrete which he employed in the walls; and as the lower court based its judgment principally on the report of the said chemist when it reached the conclusion that Nones had not complied with the contract in mixing the concrete, it is alleged by the appellant that the lower court committed manifest error in holding that the apparent volumes had been obtained and that the amounts obtained were those in which the materials were proportioned for mixing the concrete.

We must point out that, according to the contract, Nones was required to mix one part cement, two parts sand and four parts broken stone or gravel in making the concrete for the walls; that, according to section 17 of the general conditions for the contracting of insular public works, which are a part of the contract, the materials were to be inspected and accepted before being used; that they should be mixed in that work, as in all, in apparent volumes, as is contained in bodies having a certain amount of voids, as sanctioned by commercial usage, and that the absolute volumes are those contained in bodies without voids. If a box whose capacity is one cubic meter is filled with cement, sand, or broken stone, it will contain a cubic meter of cement, sand, or broken stone in apparent volume; but if each of these materials is reduced to a compact or solid mass, its voids will disappear, its volume will be reduced, leaving its absolute volumes, or cement, sand and broken stone without voids.

Having settled the foregoing, we will consider whether the court committed the error assigned in weighing the evidence.

According to the written opinion of the trial judge, the grounds upon which he based his judgment were that, although there was conflict in the evidence as to the quality of the materials used in the walls, especially as to the sand and broken stone, he was unable, upon the evidence introduced at the trial, to conclude that the sand and broken stone used were inferior or that said materials were not accepted by the superintendent of construction and his inspectors, but that, nevertheless, he arrived at the conclusion that Nones failed to comply with his contract in mixing the concrete for the walls, or allowing it to be mixed, in proportions different from those stipulated, the concrete being of a grade inferior to that agreed upon and absolutely unsuitable for the building; that neither the defendant nor the Commissioner of the Interior was guilty of bad faith or negligence or failure to act according to their honest convictions, and that the building was not delivered by Nones to the Ponce school board within the stipulated period terminating February 28, 1914.

Although to the plaintiff's allegation that the materials used by him in mixing the concrete for the walls had been previously inspected, selected and accepted by Nelson and his inspectors the defendant answered that the sand and broken stone were inferior and had not been accepted by the persons authorized to do so, we must lay aside all consideration of this question because the judge decided the conflict in the evidence in favor of the plaintiff-appellant, since his statement that he was unable to conclude that the sand and broken stone were inferior or that they had not been accepted before use amounts to a finding that the allegation of the defendant on that point had not been proved and that the contrary statement made by the plaintiff was true. On that point there is no question before us.

This point being disposed of, we have to consider whether the court erred in holding that the plaintiff had not complied with his contract in not making the mixture for the concrete

for the walls in the proportions agreed upon. That is the real issue between the parties.

Notwithstanding the fact that Wright and Miró, the inspectors whom Nelson had on the construction work, testified at the trial that the mixtures of the materials for the concrete of the three courses of the walls were always made with one part of cement, two parts of sand and four parts of broken stone; that from time to time the mixing was stopped in order to ascertain whether the materials were being used in those proportions; that other witnesses testified to the same effect, and that none of this testimony was contradicted, yet the court reached the conclusion that the mixtures had not been made in those proportions, and, therefore, that Nones had failed to comply with his contract, basing such conclusion exclusively on the report of chemist Craver under the impression, as it held, that the quantities obtained by this chemist in his analysis of the concrete used in the walls were apparent volumes different from those stipulated for in the contract and not absolute volumes. The appellant contends that this is where the court erred.

Chemist Craver made a chemical analysis of three blocks of concrete from the three courses of the walls. He testified that he could not say whether the sand was clean or whether it contained clay or lime although there were evidences thereof in the mass of the concrete, but that it was impossible for him to say whether it was originally present in the sand, the percentages found by him being the following: Sample from box No. 1, 1.60 per cent; from box No. 2, 2.28 per cent; from box No. 3, 1.35 per cent. He was also unable to say whether the rock was clean, but said that for the most part it was hard and solid. Upon being asked whether the tests and examinations made by him of the blocks showed that the concrete was composed throughout in the proportions of one part cement, two parts sand and four parts broken stone, the chemist answered in the negative and stated that, according

to his analysis, he calculated the proportions of the different materials as follows:

Block No. 1 (Box No. 2)    $\begin{cases} 1 \text{ part cement} \\ 5.7 \text{ parts sand} \\ 8.17 \text{ parts gravel} \end{cases}$

Block No. 2 (Box No. 3)    $\begin{cases} 1 \text{ part cement} \\ 5.48 \text{ parts sand} \\ 7 \text{ parts gravel} \end{cases}$

Block No. 3 (Box No. 1)    $\begin{cases} 1 \text{ part cement} \\ 4.4 \text{ parts sand} \\ 4.37 \text{ parts gravel} \end{cases}$

The chemist having been requested on cross-examination to explain the process by which he reached these conclusions, answered that he took a part of each of the samples and disintegrated it by hand, hammering it until the coarse particles of the aggregate were practically free from the adhering cement mortar; that all of the material was then placed in a sieve of one-fourth inch openings, the material remaining in the sieve being weighed and considered as coarse aggregate or gravel; that the material which passed through the sieve was treated with acid, leaving clean sand, which was dried and weighed; that by this method he was able to calculate the percentages of gravel, sand and cement in the samples of concrete, and that as the constituents of the concrete are proportioned by volume, it was necessary to divide the percentages in weight of the different materials so obtained by their specific gravities in order to calculate their proportions by volume in the concrete.

In order to show that the process used by chemist Craver determined the absolute volumes contained in the concrete and not the apparent volumes in which the materials had been mixed, and that therefore he had not answered the question put to him referring to the parts in apparent volumes, as concrete is mixed in construction work, the plaintiff introduced an abundance of expert testimony to the effect that the weight of the materials divided by their specific gravity gives

their absolute volumes in the mass, but not their apparent volumes. The experts for the defense also testified to this effect and the lower court admits that this is correct. Nevertheless it holds that the results obtained by Craver from his chemical analysis were the apparent volumes and not the absolute volumes, and arrives at that conclusion by two methods.

First, it holds that when chemist Craver was asked whether the concrete was proportioned one part cement, two parts sand and four parts broken stone, he did not answer the question by stating the volumes but used the word "parts," the same word used in the question and a word which neither in English nor Spanish can possibly refer to absolute volumes, for it is a mere matter of common sense that if a composition like concrete is mixed in proportions of parts of its respective components, these parts can be only the apparent volumes of each material used and never absolute volumes, because mixtures for concrete are made with apparent volumes and not with absolute volumes.

The mere fact that the chemist used the word "part" in his answer is not sufficient to justify holding that he referred to the apparent volumes in which the materials for the concrete were mixed and could not refer to the absolute volumes found in the concrete; for although the word may be used to express the proportions of the materials in a mass like concrete, nevertheless when employed with reference to the materials found in the solid body it seems to refer rather to the materials contained in the body, or the absolute volumes, than to the materials originally used in its composition; therefore we do not find that the use of that word by Craver shows that he found the apparent volumes and could not have found absolute volumes.

It is true that an educated person answers in response to the question put to him and when interrogated as to the parts in which concrete was mixed his answer should refer to the parts, but, nevertheless, if from his answer he appears to

refer to something else, it cannot be maintained that he answered in response to the question; and as in this case chemist Craver explained as a part of his answer the process he employed to secure the results obtained and as that process could give only absolute volumes, the use of the word "parts" by him in his answer must refer to these and not to the apparent volumes for which he was asked. Moreover, the chemist himself testified that he made the division "to calculate the proportion in volume of the materials in the concrete"; that is, as a solid body without voids, or absolute volumes.

The other method followed by the court was comparative and needs some explanation.

The plaintiff testified as an expert that he made a chemical analysis of block No. 1. The process employed was the same as that practised by Craver and by it he found the weight of the materials contained in 480 grams of the concrete to be 49.90 grams of cement, 146.15 grams of sand and 284 grams of broken stone, which weights when reduced to a unit of cement gave the following: Cement 1, sand 2.93, gravel or broken stone 5.70. Chemist Guillermety analyzed blocks Nos. 2 and 3 by the same process adopted by Craver and Nones and testified as to the weight of each of the materials in the cement. If the other results in weight are reduced on the basis of a unit of cement, the three analyses are as follows:

| Block No. 1 | Block No. 2 | Block No. 3 |
|---|---|---|
| (Nones) | (Guillermety) | (Guillermety) |
| Cement, 1 | Cement, 1 | Cement, 1 |
| Sand, 2.93 | Sand, 3.02 | Sand, 3.10 |
| Gravel, 5.70 | Gravel, 6.35 | Gravel, 6.25 |

The plaintiff wanted to make a chemical analysis of block No. 1 before the court, so as to demonstrate the weight of the materials composing the concrete, but thereupon the parties agreed and admitted that if such analysis were made the following results in weight, reduced to the unit, would be obtained:

Block No. 1
Cement, 1
Sand, 2.93
Gravel or broken stone, 5.70

As is seen, these proportions are the same as those which Nones testified that he had obtained from the analysis he made of block No. 1 prior to the trial.

Chemist del Valle testified that specific gravities are obtained from writers, and after citing and examining those generally regarded as authorities on the subject, he selected the following as the specific gravities: Cement, 3.1; sand, 2.65; broken stone, 2.80; and dividing the weights of the materials found in block No. 1, which are admitted by both parties, by the respective specific gravities, he obtained the following quotients, or the absolute volumes of the materials in the concrete:

$$\text{Cement} \quad \frac{1}{3.1} = 0.322$$

$$\text{Sand} \quad \frac{2.93}{2.65} = 1.106$$

$$\text{Gravel} \quad \frac{5.70}{2.80} = 2.039$$

Having thus obtained the absolute volumes, del Valle proceeded to determine the apparent volumes in which the materials had been mixed. For that purpose he divided the cement by 0.419, the sand by 0.68, and the gravel by 0.65, as a result of a method which he explained to the court, obtaining the following:

Block No. 1

$$\text{Cement} \quad \frac{0.322}{0.419} = 0.706$$

$$\text{Sand} \quad \frac{1.106}{0.68} = 1.623$$

$$\text{Gravel} \quad \frac{2.039}{0.65} = 3.137$$

These quotients when reduced to the cement unit give the following apparent volumes:

Block No. 1
Cement, 1
Sand, 2.28
Gravel, 4.44

Our verification of the divisions shows that the expert made a slight error as to the cement, as the quotient should be 0.768 instead of 0.706, an error which affects the final result, which should be as follows:

Cement, 1
Sand, 2.11
Gravel, 4.10

If we make the same operations with the results of the weights of the materials in blocks Nos. 2 and 3, we find that the mixtures of the three blocks were proportioned in apparent volumes as follows:

| Block No. 1 | Block No. 2 | Block No. 3 |
|---|---|---|
| Cement, 1 part | Cement, 1 part | Cement, 1 part |
| Sand, 2.11 parts | Sand, 2.18 parts | Sand, 2.23 parts |
| Gravel, 4.10 parts | Gravel, 4.56 parts | Gravel, 4.51 parts |

The expert testified that all these calculations are approximate.

In view of the foregoing, we will say that the second method followed by the court consisted in comparing the apparent volumes obtained by Nones from block No. 1 with another of those found by Craver, in order thus to conclude, in view of the slight difference between the amount of cement and of broken stone, that Craver also obtained the apparent volumes, but the court committed the mistake of taking Craver's block No. 1 to compare it with Nones' result from block No. 1 which was in box No. 1, for this box really contained block No. 3. The court, therefore, made a comparison of block No. 1 with block No. 3, and as the bases of comparison

were not exact, this cannot be taken into account to support the contention that Craver obtained the apparent volumes.

Hence, we find no ground for the conclusion reached by the lower court that Craver obtained the apparent volumes as a result of his analysis, especially in view of the fact that the method followed by him could give only the absolute volumes; and as he did not specify the weights he obtained nor the specific gravities adopted by him, it was impossible to determine at the trial whether they were exact or not, according to the authorities, and these conclusions should be absolutely disregarded.

Moreover, as the parties admitted that an analysis of block No. 1 would show certain weights which, by arithmetical calculations, the adoption of specific gravities and the allowance of a certain percentage for voids, would justify the conclusion that the mixtures were made approximately in the proportions agreed upon in the contract, the court could not disregard that admission of facts by the parties in order to give greater weight to a report not admitted by both parties, but strongly assailed, which found only the absolute volumes and did not state the averages adopted so as to permit the testing of their accuracy, and which was in conflict with the testimony of the very employees of the Commissioner of the Interior who were charged with seeing that the defendant complied with the contract. If to this be added the fact that the analysis of the blocks made by Guillermety also shows that the mixtures were made approximately in accordance with the contract, and that inspector Miró testified that when the work was suspended Nelson made some small blocks with the materials being used in the construction and in the proportions stipulated for in the contract which resulted soft so that they could be crumbled with the fingers, there is no doubt that the softness of the walls was not due to the failure of the contractor to mix the concrete in the required proportions.

For all these reasons we understand that the court com-

mitted manifest error in weighing the evidence and in holding, based exclusively on the opinion of Craver, that Nones had not mixed the concrete for the walls in the proportions agreed upon in the contract.

If the condition of the concrete employed in the walls was due to dirty sand, as stated by Beardsley and Branch in the reports they made to the Commissioner of the Interior after inspecting the walls, then the contractor would not be responsible therefor because the materials employed were accepted by the superintendent of construction, especially as the contractor complained to the board that it had ordered him to use sand which was not so good as the sand which had been rejected.

The evidence as a whole showed that this was slow-setting concrete the hardening of which should have been awaited in accordance with established practice. All the engineers agreed that that soft concrete should have been inspected for some time before tearing it down in order to ascertain whether it would set, for slow-setting concrete used in buildings constructed by del Valle and Rafael Nones hardened and became fit for use, as did the concrete used in some sewerage construction for the Department of the Interior, according to the testimony of witness Madera. Chief engineer Beardsley, of the Guayama irrigation works, an expert witness for the defendant who inspected the walls on December 16, recommended in his report to the Commissioner of the Interior on December 22 that inspection be continued for at least another month before deciding to tear it down, in order to observe whether it had increased materially in strength, and that if sufficient increase in strength could be determined the structure might then be completed in safety. The Commissioner of the Interior did not follow this advice of Beardsley, but on January 8 ordered the demolition of the walls when the concrete was already hard, and, according to the testimony of witness Skerret, engineer of the Department of the Interior, could support the higher courses.

Not only was the work done under the supervision of the Commissioner of the Interior through his employees, but according to the report made to him by Branch, a first-class mixer was used and the concrete was properly laid. Although the plaintiff was not required to mix concrete of a particular quality, inasmuch as his contract does not so stipulate, nevertheless the physical test of the strength of the blocks showed, according to the calculation made by Madera from the plans, that the weakest of them resisted a greater pressure to the square inch than any of them were required to bear. We have examined a block which was sent up by the lower court and which was introduced in evidence at the trial and find that its appearance justified the report made on it by del Valle and Larrínaga that it was hard and strong and that its materials could not be separated by hand.

It is true that Nones did not deliver the completed building on February 28, 1914, as was agreed, but his failure to do so was caused by the action of the defendant, through its representative, the Commissioner of the Interior, in ordering the suspension of the work and. later the demolition and reconstruction of the walls at his cost, without sufficient cause therefor. Moreover, under section 15 of the instructions to bidders the contractor was entitled to an extension of time equal to the time of the suspension.

In consequence of all the foregoing, the judgment appealed from must be reversed.

The plaintiff alleged and the defendant admitted that the value of the foundations constructed by Bruno, whose rights he acquired, and of the walls which he built amounted to $5,159.18, which sum has not been paid to him. He also alleged and the lower court found that his profit from the work of construction would amount to $4,500, making a total of $9,659.18.

He also made a claim of $6,950 for orders for material placed by him, but later withdrew it. As to the $5,067.91 claimed by him as the value of the materials, tools, implements,

etc., which he had to purchase for the work, as the defendant stored these effects subject to his order and he can dispose of the same, we are of the opinion that he should not be paid for them.

The judgment appealed from should be reversed and another rendered rescinding the contract of July 15, 1913, for the construction of the Ponce school building, known as Job 63, which was entered into by the Commissioner of the Interior, the president of the school board and José A. Bruno and assigned by Bruno to Adolfo Nones and adjudging that the plaintiff herein recover from the defendant school board of Ponce the sum of $9,659.18, dismissing the counterclaim of the defendant and imposing on each party his own costs.

*Reversed.*

Chief Justice Hernández and Justices Wolf, del Toro and Hutchison concurred.